Good afternoon. My name is Susan Trautman. I represent the appellants Andrew Craigie, Susan Morrow, and Michelle Beeler. I will try to reserve a few minutes for rebuttal. This case arises out of the alleged negligence of another defendant, Dr. Terrence McGee. Dr. McGee was the MRO who evaluated and verified Mr. King's positive laboratory results. The appellants are entitled to qualified immunity because Mr. King had a meaningful pre-termination opportunity to explain the positive lab results both to Dr. McGee and to his supervisors. The process followed was consistent with well-accepted, reliable drug testing protocol and with fundamental principles of due process. Framed in terms of the second prong of the qualified immunity analysis, it would not have been clear to a reasonable officer in the appellant's position that the pre-termination process actually afforded Mr. King was inadequate. Specifically, what was afforded him? The steps? Yes. He was first notified on February 17, 2011 through Dr. McGee's office that his drug test was positive for both codeine and morphine. The following day, his supervisor or one of his supervisors, Ms. Morrow, called and told him, and I'm relaying the facts as Mr. King's version of the facts. On February 18, Morrow called Mr. King and told him that his morphine level was extremely high. She also at that point suspended him and told him that there would be a meeting the following week. Mr. King understood the purpose of that meeting would be to discuss his drug test result, and he asked that Dr. McGee attend the meeting. As scheduled, there was a meeting on February 22. Morrow, who was the chief nursing officer, Beeler, who was the human resources director, and Mr. King's immediate supervisor all attended that meeting in person, and Dr. McGee attended that meeting telephonically. There are emails in the record that suggest that meeting lasted approximately an hour and a half. During that time period, Mr. King's Tylenol No. 3 prescription was a topic of conversation. Mr. King said that he had taken one tablet on the morning of the drug test, and in response to that comment, Dr. McGee said, well, one tablet would not account for the levels of morphine in your urine sample, and according to Mr. King, described the levels as nearly fatal. Not nearly fatal, but something along that line. Mr. King talked about various medical conditions he thought that might contribute to or might account for the positive drug result, including fatty liver disease and diabetes. He talked about the fact that he was on antibiotics. So he had a fairly good opportunity during that meeting itself to provide some alternative explanations for the positive test result. In fact, he had come to the meeting with a list of things that he thought might account for the positive result. He also met separately with Andrew Craigie, the CEO, that day, and again provided some alternative explanations for the positive test result. In those meetings and after those meetings, Mr. King was encouraged to provide medical records documenting his reported diseases and any other information that he thought was relevant, and he did so. He had about five weeks after that initial meeting on February 22nd to provide information. He provided his Tylenol prescription to Dr. McGee. He provided medical records. He provided letters from his health care providers. He provided a document that he characterized as a rebuttal to the accusations. So over this five-week period, the information is flowing back and forth. What was the governing law at the time that your clients would have or should have known of in terms of the guidance for pre-termination due process from public employment? Well, I think there was really no applicable guidance for the factual circumstances here in the context of a drug screening. Well, cases don't have to be quite that exact. What in general was the state of the law in your view? An employer is obligated to provide a name-clearing hearing to an employee. I believe the name-clearing hearing is preferably provided prior to any publication of a stigmatizing statement. The contours of the name-clearing hearing are not defined by the law other than your typical due process characterization of the obligation to provide some notice and an opportunity to meet the charges or to respond to the charges against you. What was the state of the law in your view with respect to a post-termination additional opportunity? I believe that a post-termination opportunity is only required if the pre-termination procedure either is inadequate or doesn't happen at all. A lot of the name-clearing hearing cases are talking about a hearing being provided as a remedy after the fact because there was no hearing prior to the termination. So does this whole case basically turn on when the hospital and Mr. King received an actual copy of the laboratory report and whether Mr. King should have been afforded an opportunity to hire an expert to argue with Dr. McGee over how to interpret that report? Pretty much. Under the mandatory guidelines that govern drug testing, the MRO is a gatekeeper. That laboratory information, the quantitative values of codeine and morphine are provided to the MRO, not to Mr. King. I mean, excuse me, not to the hospital, and Mr. King did not get a copy from the hospital of that information. Well, he did submit a split sample of the urine that was taken to his own laboratory, and he got that test result, which, as I understand it, corroborated the test result that Dr. McGee had received. Is that correct? Mr. King requested a split sample be sent to another laboratory. That laboratory result confirmed the positive result and the levels of morphine and codeine that the first lab had found. So your answer is yes? Or yes with an explanation? The only question is, did Mr. King get that second laboratory result? No, it was just a simple question. As I understand the record, a split sample was taken, so we still had some of his urine. He submitted that to his own lab. That lab produced a test report which was essentially consistent. The numbers weren't identical because they never are, but it was very close and essentially corroborated the report that Dr. McGee had received. That's true. Okay. So maybe I should take this up with Mr. King's counsel, but I'm trying to figure out then beyond his complaint that he didn't receive the test report that Dr. McGee had in hand, which was received by the hospital when? That's not in the record after Mr. King's termination. Termination. Okay, so the hospital got it down the road. Down the road. Okay. So besides that, then is the other complaint that he has, as you understand it, I didn't have an opportunity to hire my own expert to refute what Dr. McGee was saying? That's part of it, and I don't want to make Mr. King's argument for him, but he is going to say that he never got the report from the second lab. Although it was his, he initiated the split sample. I thought he called the lady at the lab and she said, I can give you the test result that you requested, but I can't give you the test result from the first sample. That's true, and that was one or two days after his termination. His complaint is that this didn't happen pre-termination. Right. He didn't have that information pre-termination, therefore he could mount an argument that really goes to the negligence of Dr. McGee. It does not go to the process that was provided. What prompted my questioning was Judge Graber's question about what the state of the law was as to what process was due to Mr. King at the time. And as I thought I heard your answer to be, we provided him essentially with a pre-termination hearing, which was all the law required in order to meet due process concerns. Is that your position? Yes, it is. Okay. All right. You have about four minutes left. I didn't know how much you wanted to say for about all. Well, let me just quickly address the question that the court directed us to in terms of the most recent Supreme Court case on the qualified immunity issue. I don't think that that case really changes the rule as far as qualified immunity. It simply emphasizes that the clearly established inquiry must be made with reference to a specific factual context and that to deny qualified immunity, there must be precedent that establishes beyond debate that the conduct at issue was unconstitutional. And there is no case in either the Ninth Circuit or the Supreme Court defining the requisite parameters of a name clearing hearing in the circumstances presented here. I'll try to reserve two minutes and just quickly address the second primary issue in my view, and that's whether or not a name clearing hearing was required at all because that only comes into play if there's a substantially false statement. And in this case, the only statements made by the appellants were true. Mr. King's drug test was positive. That's what they said in the termination letter. That's what they said in the mandatory report to the Nursing Commission. So I believe that Mr. King can't even make out the basic elements of a stigma plus case. Thank you. Thank you, counsel. We'll hear from Mr. Van Wert, I believe. I hope I pronounced that correctly. Pronounced it perfectly, Your Honor. Ron A. Van Wert on behalf of the plaintiffs and respondents in this matter, Dennis and Tricia King. I think it's important from the outset to clarify an issue that was asked by Judge Tolman in relation to the split sample. The policies and procedures of the hospital allows for the individual to request a split sample, but that split sample and the testing is handled by the hospital through its subcontractors. Was he challenging the results of the split sample that he himself requested? The results, in other words, no, that it was a positive test and that the levels of coding and morphine, we are not contesting that. Okay. So doesn't this case really turn on his argument that due process required, A, that he be provided pre-termination with a copy of the lab report, and, B, given an opportunity to hire an expert who could then quarrel with Dr. McGee over how you interpret these two lab reports? What it comes down to is that he had the right to a name-clearing hearing that was not provided, and during that name-clearing hearing. Let's assume for the sake of my hypothetical that his name-clearing hearing was the post-termination events that opposing counsel outlined, the five weeks, the meetings, the written material that he submitted. Wasn't that pre-termination? It was pre-termination. Right. So let's assume that the name-clearing hearing occurred during that phase of the case. What additional proof or process do you contend that Mr. King was entitled in order to clear his name? The decision to find that it was a positive finding was directly dependent on the levels of codeine and morphine. He was never provided that. If provided that, yes, he could provide the evidence to show that it was not abusive quantities, that it was consistent with his prescription, and that was shown in each of the events that took place after his termination. Well, I have a number of questions, but I want to start with this one. Is it your position, this is just clarifying, it's not meant to be anything other than that, is it your position that even if the pre-termination hearing had been sufficient in your view, he would have been entitled to another hearing post-termination, or is your argument instead that pre-termination could be okay but this one wasn't? The second, the latter. Okay, so the argument, so for purposes of this case, you agree that a sufficient pre-termination hearing could be enough. And so my question to you is in the context of qualified immunity, what case or cases suggested that specifically he had to be given the kind of information that you are saying was missing, that is the actual lab results? Why couldn't a reasonable person in the shoes of the defendants have felt or thought that what they received, which is the intermediary's report, is the same thing that your client received and that was enough? A few things. First of all, when we're talking about what is reasonable of these particular defendants, we have to recall that in this case they had no training or knowledge of what a name-clearing hearing was, what due process was, or a louder mill hearing was. Each one of them asked in their deposition had no idea. Well, so what? If they did it, it doesn't matter whether they knew that what they were doing was required. I'm sorry, Your Honor, you asked if they thought it was sufficient. They didn't even know what sufficiency was. So with that said, in relation to this particular case, they had not made a determination to terminate. When they had that discussion in February, there was not even a positive test result. The actual verification was negative at that time, not until a letter by Dr. McGee at the end of March, March 28th, that they each reviewed, and based on that letter the following day made the determination that he should be terminated. And that letter was specifically dependent on the levels of the test, which he never had. So the question of what case actually presents the court with the same facts, if you will, that an individual with a lab test has the right to those, it really comes down to what is the hallmark of due process, and that's fundamental fairness. If you're going to make your decision dependent on the levels, then the individual should have the opportunity to rebut those levels, which he never did. But, counsel, the Supreme Court reminded us in the case that we sent out to you in the order that qualified immunity protects all but the plainly incompetent. And in this case, and due process generally requires notice and an opportunity to be heard. So even if these three rural county hospital defendants had not been trained in the intricacies of name-clearing hearings, why doesn't the process that was afforded him in that five-week period meet fundamental fairness of notice and an opportunity to be heard? Because the notice and opportunity to be heard in a timely and appropriate manner is dependent on having notice and opportunity for the basis of determination. But here, counsel, that's my problem with your argument, and maybe you can correct it. If I'm misunderstanding, I'd like to know that, because I thought that the record showed that the decision was made based on the intermediary's report to the hospital and that the hospital did not make its decision on the basis of the actual numerical lab results. If that's true, then your client had in hand the exact thing on which the hospital was basing its decision. Am I wrong about the record? Respectfully, yes, Your Honor, because if the hospital is making the determination that just from a positive drug result from legitimate prescription drugs is a reason to terminate, we have another case on an ADA and a state disability claim. I think we're talking past each other. Let me just ask it a different way. In your view of the record, did the hospital make its decision based on Dr. Magee's report, or did it make its decision based on the numerical lab results on which Dr. Magee had relied? Which was it? The numerical lab results that his decision was based on to find a positive reading. His was. What did the hospital have in hand at the time of the termination decision? Did they have the actual numerical results? Yes, they do, and I'll point the court to that. That's what I'm trying to find out. In Ms. Morrow's declaration, which is 155 of the record, she states, after receiving Dr. Magee's letter, I spoke with Ms. De Herrera, Ms. Beeler, and Mr. Craigie. We decided to terminate Mr. King's employment based on his positive drug test result. But that's Dr. Magee's report. Right, and so if we look at the letter, which is also included, and that starts on 166 of the record, Your Honor, it says that he forwarded a prescription of Tylenol-3 from his dentist. Ordinarily, this would have sufficed to overturn his positive finding. While the prescription for Tylenol-3 should have explained the positive finding, his urine levels were extremely high. Then he points out exactly what those levels are. Coding equals 30,144 nanograms per milliliter. Morphine equals 6,412 nanograms per milliliter. Goes on to say, these levels are not consistent with Mr. King's version of events. These are levels in the low fatal range. These are, in my opinion, abusive levels. The test should now be considered positive because it's negative B4, should now be positive because no reasonable medical explanation for these levels was able to be established. When did your client first receive a copy of this letter? Through discovery. He received the levels after termination. But the hospital counsel just said that the hospital didn't receive the test results until after his termination. Are you saying that's not true? Because as I read the portion of the record that you just quoted, she's essentially relying on Dr. McGee's letter for those statements. The letter has the results, the levels of the test in it incorporated, and that's what I read with relation to the coding equals these levels. That's the March 24th letter they received on March 28th. Ms. Morrow declared and testified they reviewed that letter, these three defendants, and determined that they're going to terminate Mr. King the following day they terminate him. Right, so they're relying on Dr. McGee's letter. They're relying on his letter with the positive findings that are only positive because of the levels of morphine and coding that they never provided to Mr. King. I thought there was testimony, and I believe it was from Ms. Morrow, but maybe I've got my defendants confused, that the actual numbers themselves wouldn't mean anything to them. They have to rely on the medical review officer to tell them what the significance of those test numbers are. Well, now we're going into a question of reliance and the right to rely. However, the issue is does Mr. King have the right to a name-clearing hearing, and what is fundamentally fair? This is based on a letter that has the results and says, I would give him a negative result if not for these levels. They never gave Mr. King the levels to, out of fundamental fairness, say, wait a second, look at this. Here's the reason why those levels are consistent. Is it your position that if Mr. King had had those levels he would have supplied something else to the hospital? Because I guess my question is how would he know what the significance of those levels are? This goes back to your question, Your Honor, and absolutely he would have. He would have got an expert just like he did in front of- He would have to get an expert. He wouldn't be able to tell from the numbers. So that gets us back to what did the hospital rely on? And as I read the record, they relied on the opinion of the independent medical review officer, Dr. McGee, to interpret the results of the lab tests. And the question is would a reasonable hospital official know that he or she had to do more than that before making the decision in reliance on the MRO's opinion and considering all of Mr. King's explanation for why those numbers were so high to terminate him? Well, yes, because in relation to, again, the letter they have to rely on, we go back to those levels. But more importantly, when we determine what is the basis for a name-clearing hearing and the reason why you have to give one is simply that the allegation you're making is based on moral turpitude or rather dishonesty, morality issues. Two of that is contested, and then we get into the publication issue. But is your argument that a reasonable hospital official would have ordered an adversarial hearing, before whom I don't know, maybe the board, at which we'd have a battle of the experts, Dr. McGee versus Dr. or Mr. King's expert, and then that adjudicator would decide whose opinion is correct, almost like a trial? What would a reasonable hospital official know to do in this circumstance in order to be entitled to qualified immunity? No, I would not expect an adversarial proceeding in the way that there's got to be a third party or an adjudicator to make the determination. However, they do have to provide the opportunity for the individual to respond to the allegations as the basis for termination. And in this regard, the only way to do that, as recognized by the district court, was to provide those levels. And then, just as he did in the end with going to NCWAC and going to the unemployment agency, showing them that those are consistent. In fact, Dr. McGee in this case ultimately said, I wish I would have never got involved in the toxicity. Well, I can understand why now he says he doesn't want to have anything to do with this case. But too late now, you're named as a defendant in a lawsuit. But the question I have for you is, is your position that you're entitled to a post-termination hearing after each of the three reports? First, after the letter was prepared and put in his personnel file. Second, after the complaint was filed with the nursing regulators. Third, for the testimony in front of the employment security hearing examiner. And I guess fourth, when they challenged the ALJ's decision. I mean, at what point do we say you've had all the process that the law requires? The position is that he should have had the opportunity in the first place, and he never did. Could it be post-termination? There is that possibility. Each one of those things provided another publication. And to Judge Graber's question, relating to what case was out there, we have Cox v. Roskelly, which dictates the outcome in this case. Which is exactly on point in relation to what, that there was an allegation of misconduct, that it was in the personnel file, therefore published, and he contested it. And that court also looked at qualified immunity and basically said, this has been known since 1998, only three months before the decision in Roskelly, this had been known, Cox v. Roskelly, for seven years by the time they got to this individual. So a reasonable individual in the defendant's shoes would have known what a name-clearing hearing was in the first place, and would have certainly known in this case he should have the right to one. And that should have occurred, and the information provided was appropriate notice and opportunity. And that name-clearing hearing would consist of engaging and summoning an expert who would provide a contrasting opinion to Dr. McGee. Well, here's the, because we know what Dr. McGee is saying now, what it would have provided is understanding of really what those numbers show, and from an expert who should be dealing with this in the first place. The answer is yes. The name-clearing hearing has to include my ability to engage and call an expert to refute Dr. McGee's expert opinion. A name-clearing hearing has to give you the opportunity to do so. It doesn't have to include that, but it has to give you the opportunity, which he never had because he didn't have the numbers. He could have got a declaration and other information from the expert to say it's consistent with the prescribed medication. That's what it allows for. Judge Levy has a question, I believe. We shift around from having a positive report to a negative report and back to a positive. Now, I take it that if the level is somehow explainable by the medicine that this man is taking, then negative means something different than a total absence of foul drugs, right? That's correct. It means that it's negative based on the policies and procedures and what MRO has to look like because we understand that prescribed medicine should be allowed. So the only thing in the context of this case that makes any test positive is the level. Absolutely. Spot on. Absent the level and given the explanation, even though there's drug present, it's labeled negative. Am I right? Correct. All right. That's all. Thank you, counsel. Your time has expired and Ms. Trotman has some rebuttal. And I have a question that's bothering me about your side of the case, and that is the following. The letter of March 24th does contain the specifics about the levels. The decision to terminate was made the following day, and there was no opportunity to respond specifically to that letter, which became the purpose. And in louder mail, it does say that the employee is entitled to an explanation of the employer's evidence. So why isn't there a problem that he wasn't given an opportunity to look at the more specific or to respond to the more specific evidence before the termination was made, based on just the plain words of louder mail? I think Judge Tolman answers that question for me when he points out that what the hospital relied on, the evidence that the hospital factored into its decision making, was the result reached by the MRO. Yes, but the result was contained in a letter that specified the levels, correct? That is true. Okay, and he did not get a copy of that letter before the termination, also correct? That is also true. Okay. I think what this really goes to is Mr. King's claim of negligence against Dr. McGee. What he's saying is that in light of those levels, Dr. McGee should have issued a negative result. Dr. McGee didn't. The hospital did not undertake its own analysis of the quantitative levels. It relied on Dr. McGee's expertise. Yes, but it relied also on the numbers, and had he had those numbers, he might have said something different if he had another meeting or another opportunity before the termination. The hospital had those numbers. And the fired employee didn't. And the employee didn't, but they weren't factored into the employer's decision. But you just told me you relied on that letter. Did you rely on the letter or did you not rely on the letter? We relied on the conclusion that Dr. McGee reached. So you relied on half the letter? Yes, we relied on the conclusion. And if I may, this is unfortunate that the letter even got to us. It was sent from Dr. McGee to QCL. You should not have received those numbers. We shouldn't have had that information. The mandatory guidelines say the lab results, the MRO is the gatekeeper. That information is not to be forwarded to the employer. We get it by accident or not of our own volition and, again, relies simply on what we're supposed to rely on, which is the MRO's analysis of the situation. I think that you have to look at the process that was provided under Matthews. And the fact is that when an employee is terminated because of a positive drug test, the risk of an erroneous deprivation hinges primarily on the reliability of the drug testing process that includes the MRO. If that process went wrong here because Dr. McGee reached the wrong conclusion, that doesn't invalidate the process itself. It doesn't mean the process was constitutionally infirm. Thank you, Counsel. You've exceeded your time. The case just argued is submitted, and, once again, I want to express our appreciation for very helpful arguments from both counsel.
judges: Leavy, Graber, Tallman